## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>          **Plaintiff,**<br>     **v.**<br><br>**NELSON GOMES, MICHAEL LUCKHOO-BOUCHE, SHANE SCHMIDT, DOUGLAS ROE, KELLY WARAWA, FFS CAPITAL LIMITED, PAIFANG TRADING LIMITED, ARTEFACTOR LIMTED, ATLANTEAN MANAGEMENT CORPORATION, MEADOW ASIA LIMITED, and THYME INTERNATIONAL LIMITED**<br><br>          **Defendants.** | **Civil Action No. 20-CV-____ (___)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Nelson Gomes ("Gomes"), Michael Luckhoo-Bouche ("Luckhoo"), Shane Schmidt ("Schmidt"), Douglas Roe ("Roe"), Kelly Warawa ("Warawa"), FFS Capital Limited ("FFS Capital"), Paifang Trading Limited ("Paifang"), Artefactor Limited ("Artefactor"), Atlantean Management Corporation ("Atlantean"), Meadow Asia Limited ("Meadow Asia"), and Thyme International Limited ("Thyme International") (collectively, the "Defendants").

## SUMMARY

1.      Beginning in or before January 2018 and continuing through the present, Gomes has engaged in a fraudulent business through which undisclosed corporate control persons can illegally dump their stock in the public markets. Gomes has arranged to sell shares without

effective registration statements of multiple companies to the public. Gomes routinely uses foreign nominee entities and trading accounts to conceal the identities of his control group associates while illegally selling large amounts of stock to investors in the open market. Gomes' actions allow such control groups to evade the restrictions of the securities laws of the United States, which restrict the sales of shares by corporate control persons, absent public registration of such sales. The control persons have defrauded ordinary investors by misleading them to believe that they were purchasing shares in the ordinary course of the market, when—in reality—the shares being offered were being dumped by company insiders. Such illegal stock sales were boosted by promotional campaigns conducted by various stock promotors. In some instances, the promotional campaigns included false and misleading information about the companies whose shares Gomes was selling, including false and misleading claims designed to fraudulently capitalize on the COVID-19 pandemic.

2.     Luckhoo has coordinated with Gomes in multiple stock dumps by opening, and serving as the nominal director of, one of the brokerage accounts through which corporate control persons concealed their identities.

3.     One of the illegal stock dumps that Gomes arranged involved a fraudulent scheme to sell the securities of Sandy Steele Unlimited Inc. ("Sandy Steele"). Between at least January 2018 and April 2020, Gomes, Schmidt, Roe, Warawa, Luckhoo, and entities under their direct or indirect control or acting in concert with them (hereinafter referred to as the "Sandy Steele Control Group"), including Sandy Steele Control Group members Atlantean, Artefactor, Meadow Asia, and Thyme International, secretly controlled Sandy Steele stock that was fraudulently represented as available for trading, and sold that stock into increased demand that was generated through false and misleading stock promotional activities. These stock

2

promotions included false claims in March 2020 that Sandy Steele could produce medical quality facemasks to be used during the COVID-19 pandemic.

4.     The scheme to sell more Sandy Steele shares to investors was partially thwarted when the Commission suspended trading in the securities of Sandy Steele, which was effective before trading commenced on April 6, 2020.

5.     From at least June 2018 through the present, Gomes and Luckhoo, using entities they control—FFS Capital and Paifang—have similarly sold shares in concert with undisclosed public company control groups, generating more than $25 million in proceeds of illegal stock sales. The Commission has suspended trading in the securities of three other companies that Gomes and Luckhoo were principally responsible for selling. Specifically, since January 2020, the Commission has suspended trading in the securities of Rivex Technology Corp. on January 8, 2020, Bioscience Neutraceuticals, Inc. ("Bioscience") on May 11, 2020, and WOD Retail Solutions, Inc. ("WOD Retail") on May 21, 2020. Gomes' and Luckhoo's conduct is ongoing. Indeed, they continue to hold millions of shares of publicly traded stocks in their brokerage accounts that they are poised to dump.

6.     As a result of the conduct alleged herein, Gomes and FFS Capital violated Sections 5(a), 5(c), 15(b) and 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(e) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c), and Gomes also violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder.

7.     By coordinating with Gomes in the conduct alleged herein, Luckhoo violated Sections 5(a), 5(c), 15(b) and 17(a)(1) and (3) of the Securities Act and Sections 10(b) and 20(e) of the Exchange Act and Rules 10b-5(a) and (c) thereunder; and Paifang—the entity directed by

Luckhoo—violated Sections 5(a) and 5(c) of the Securities Act.

8.     In connection with the illegal sale of Sandy Steele shares, Schmidt violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; Doug Roe, Kelly Ann Parsons Warawa, and Atlantean each violated Sections 5(a), 5(c) and 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder; and Artefactor, Meadow Asia, and Thyme International violated Sections 5(a) and 5(c) of the Securities Act.

9.     The Commission seeks emergency preliminary relief, including a temporary restraining order against further violations of the federal securities laws against certain of the defendants and an emergency asset freeze to preserve the assets necessary to satisfy an eventual judgment against all of the Defendants. The Commission also requests a repatriation order to facilitate the return of assets to the United States for eventual distribution to harmed investors.

10.     The Commission seeks permanent injunctions against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; an order barring Gomes, Schmidt, Warawa, Luckhoo, FFS Capital, Paifang, Atlantean, Artefactor, Meadow Asia, and Thyme International from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)]; an order permanently enjoining Gomes and FFS Capital from directly or indirectly, including, but not limited to, through an entity owned or controlled by Gomes, participating in the issuance, purchase, offer, or sale of any

4

security; provided, however, that such injunction shall not prevent Gomes from purchasing or

selling securities listed on a national securities exchange for his own personal account; and as to

all Defendants, such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), 78aa].

12.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices,

transactions and courses of business alleged in this Complaint occurred within the District of

Massachusetts, and were affected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For

example, certain individuals who reside in the District of Massachusetts purchased the stock of

Sandy Steele and were the targets of cold-calls touting Sandy Steele as a good investment

opportunity.

## DEFENDANTS

13.     **Nelson Gomes**, age 38, is a Canadian citizen, and, on information and belief,

resides at various times in the Bahamas and Hong Kong.

14.     **Michael Luckhoo**, age 31, is a Canadian citizen, and resident of Mississauga,

Ontario.  Luckhoo is listed as a director of Paifang on brokerage account applications.

15.     **Shane Schmidt**, age 52, is a Canadian citizen, and a resident of Vancouver,

British Columbia.

16.     **Douglas Roe**, age 47, is a Canadian citizen, and a resident of Vancouver, British

Columbia. Roe was charged by the Commission in connection with a penny stock scheme in May 2017 and settled those charges in August 2018, in a resolution which included a civil penalty of $50,000 and a penny stock bar. *SEC v. Douglas Roe and Donald Lindo*, No. 17-cv-01293 (D. Md. 2017). Roe is the president and sole director of Atlantean.

17.     **Kelly Warawa**, age 36, is a Canadian citizen, and resident of Vancouver, British Columbia. Warawa has signing authority over the bank accounts for Atlantean.

18.     **FFS Capital Ltd.** (formerly known as FIFO Trader Ltd.), is a Hong Kong company incorporated on March 2, 2018. The name change to FFS Capital was effective as of January 18, 2019. Gomes is the beneficial owner and sole director of FFS Capital. In arranging to open and trade through brokerage accounts, Gomes has represented to at least one brokerage firm that FFS Capital makes "investments in public equities on behalf of the beneficial owner of the company." At times relevant to facts described in this Complaint, Gomes also traded stock through a company called FIFO Trader LLC.

19.     **Paifang Trading Ltd.** is a Hong Kong company incorporated on February 1, 2019. The listed beneficial owner of Paifang is an individual who is identified as a certified public accountant from Hong Kong. Luckhoo and Paifang's listed beneficial owner are the directors of Paifang. In arranging to open and trade through brokerage accounts, Luckhoo represented to at least one brokerage firm that the business purpose of Paifang, "is to hold investments on behalf of the beneficial owner." On June 13, 2019, Luckhoo emailed Paifang's broker to submit paperwork authorizing Gomes to trade on behalf of Paifang.

20.     **Atlantean Management Corporation** is a Canadian company incorporated in November 2017. Roe is the beneficial owner of Atlantean. Warawa has signature authority over a bank account held in Atlantean's name.

6

21.     **Artefactor Limited** is a Hong Kong company incorporated in November 2017, with its principal place of business listed as being in Vancouver, British Columbia, where Schmidt, Roe, and Warawa reside.  The purported beneficial owner of Artefactor is a Mexican national.

22.     **Meadow Asia Limited** is a Hong Kong company incorporated in July 2016. Meadow Asia identifies its registered office as being in Hong Kong on at least one brokerage form.  The purported beneficial owner of Meadow Asia is a second Mexican national.

23.     **Thyme International Limited** is a Hong Kong company incorporated in July 2016.  Thyme International identifies its registered office as being in Hong Kong on at least one brokerage form.  The purported beneficial owner of Thyme International is a third Mexican national.  Thyme International was incorporated on the same day as Meadow Asia (July 7, 2016), and their corporate numbers are nearly consecutive, 2399956 and 2399954, respectively.  Thyme International and Meadow Asia initially had the same purported beneficial owner, who resigned from both entities four days apart (in January 2019).  Thyme International and Meadow Asia share the same address on business registration documents and the same address on tax and brokerage records.  Thyme International and Meadow Asia sell shares through the same brokerage firm and have used the same notary on documents submitted as part of brokerage account applications.

## BACKGROUND

24.     Before selling stock, control persons are required to: (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. § 77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. § 240.144], including limitations on the amount

of stock a control person can legally sell. Also, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock. Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

25. "Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission. In addition, stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale). A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management. It also includes disclosure of any person or group who is the beneficial owner of more than 5% of the company's securities.

26. An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person). "Control" means the power to direct management and policies of the company in question. Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer. As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

8

27.    "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement.  Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  Thus, when a control person buys publicly-traded or otherwise unrestricted shares in a company s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

28.    A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether shares are restricted from resale.

29.    The Over-the-Counter ("OTC") Markets is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Public companies that do not have an obligation to file reports with the Commission may, nonetheless, choose to file public reports (such as quarterly and annual statements) on the OTC Markets website for investors to review and consider when making investment decisions.

30.    "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

## OVERVIEW OF GOMES' CONDUCT

31.     From approximately 2018 through at least May 2020, Gomes has facilitated stock

dumps of shares of more than twenty penny stock companies.  These stock sales have generated

trading proceeds in excess of $25 million through brokerage accounts held in the name of FFS

Capital and Paifang.  Many of these companies were the subject of promotional email campaigns

conducted by one or more individuals using a single email marketing account in conjunction

with multiple internet domain names.

32.     Sandy Steele, Bioscience, and WOD Retail are representative examples of the

trading that results from Gomes' fraudulent scheme.

33.     For each of the issuers listed below, Gomes, working with Luckhoo, FFS Capital,

and Paifang (hereinafter referred to as the "Gomes Group"), worked in concert with various

undisclosed control groups, gained control of the issuer's stock available for trading, and utilized

foreign-based entities and brokerage accounts to conceal the control groups' ownership and

control while selling.  The Gomes Group routinely used one or more nominee entities at its

disposal to take deposits of the issuer's stock in amounts below 5% of the total outstanding stock

for each nominee entity, and then deposited the stock with foreign broker-dealers to sell into the

U.S. markets.

34.     In each instance, the Gomes Group dominated the market for the issuer's stock in

that they exercised significant control over each company's shares that were deposited and

marked as available for trading (the "float").  Such shares held by the control groups were legally

restricted and were not eligible for public trading.  The following table illustrates seven

examples, including Sandy Steele, Bioscience and WOD Retail, where the Gomes Group and

others with whom the Gomes Group was coordinating arranged to liquidate significant amounts under its control:[1]

| Issuer | Date of First Transfer to Gomes Group | Cumulative Gomes Group Shares Available for Trading | Total Shares Available for Trading As of Last Gomes Group Deposit | Gomes Group Percentage of Shares Available for Trading | Minimum Gross Proceeds to Gomes Group |
|---|---|---|---|---|---|
| County Line Energy Corp | 6/5/2018 | 8,147,265 | 12,917,452 | 63.07% | $ 3,599,584 |
| Rivex Technology Corp | 4/24/2019 | 605,000 | 910,000 | 66.48% | $ 2,438,092 |
| Sandy Steele Unlimited, Inc. | 7/30/2019 | 12,000,000 | 14,834,842 | 80.89% | $ 1,842,757 |
| WOD Retail Solutions, Inc. | 11/1/2019 | 40,000,000 | 41,069,535 | 97.40% | $ 1,666,441 |
| Bioscience Neutraceuticals, Inc. | 10/3/2019 | 800,000 | 837,516 | 95.52% | $ 1,387,164 |
| Bionovate Technologies Corp | 2/21/2019 | 5,013,000 | 5,013,898 | 99.98% | $ 1,363,515 |
| Phoenix Apps, Inc. | 12/20/2018 | 4,450,000 | 5,455,000 | 81.58% | $ 1,288,791 |
| **TOTAL** | | | | | **$ 13,586,344** |

35.     There was not an effective registration statement for any of the stock sales summarized in Paragraph 34. SEC Rule 144 provides a safe harbor for affiliates of public companies to sell stock in their companies without a registration statement in effect if the affiliates comply with certain provisions and limitations, including selling not more than 1% of the issuer's outstanding stock over a three month period. The Gomes Group and others with whom the Gomes Group was coordinating stock sales did not comply with Rule 144's safe harbor provisions. For example, when selling the securities referenced in the table in Paragraph 34, the Gomes Group either (a) did not comply with Rule 144's holding period requirements after acquiring shares from other shareholders; or (b) the Gomes Group and others with whom the Gomes Group was coordinating sold greater than 1% of each issuer's total outstanding shares (meaning, the total of the shares that were identified as restricted from public trading plus any unrestricted shares) during a three month period, as the table below reflects:[2]

---

[1] For this table, the "Gomes Group" also includes information about transfers, deposits, and proceeds related to other shareholders—in addition to Gomes, Luckhoo, FFS Capital, and Paifang—who traded in concert with the Gomes Group.

[2] The Bionovate Technologies Corp sales by Gomes reflected in the table below relate to 2019, prior to the issuer's 1-for-100 reverse split that was effective January 9, 2020.

| Issuer | Shares Outstanding | 1% Threshold | 1% Test Period | Shares Sold During Test Period | Percent |
|---|---|---|---|---|---|
| County Line Energy Corp | 72,605,140 | 726,051 | 10/9/19 - 10/11/19 | 737,420 | 1.02% |
| Rivex Technology Corp | 6,200,000 | 62,000 | 11/4/2019 | 84,700 | 1.37% |
| Sandy Steele Unlimited, Inc. | 89,745,588 | 897,456 | 10/24/19 - 10/31/19 | 903,026 | 1.01% |
| WOD Retail Solutions, Inc. | 101,075,307 | 1,010,753 | 12/16/19 - 2/4/20 | 1,065,425 | 1.05% |
| Bioscience Neutraceuticals, Inc. | 8,042,516 | 80,425 | 3/23/20 - 3/25/20 | 99,678 | 1.24% |
| Bionovate Technologies Corp | 15,579,749 | 155,797 | 3/4/2019 | 204,000 | 1.31% |
| Phoenix Apps, Inc. | 45,300,000 | 453,000 | 2/27/19 - 3/15/19 | 495,800 | 1.09% |

36.     As described above, one or more individuals acting in concert with Gomes have

used a single email marketing account, in connection with various internet domain names, to

distribute messages to potential retail buyers of stocks.  These promotional messages have

included, in multiple instances, false and misleading information about various issuers whose

securities were sold by the Gomes Group.  The following chart illustrates the connections

between the promoter's accounts and some of the stocks the Gomes Group has sold, including in

concert with others:



**EXAMPLE: SANDY STEELE**

**The Sandy Steele Control Group Takes Over Sandy Steele**

37.     Sandy Steele is a publicly traded company that was incorporated in Minnesota under a different name in 1968.

38.     On or about March 20, 2019, Schmidt caused Sandy Steele to make a public filing on the OTC Markets website, disclosing a previous change of control.  Specifically, Sandy Steele claimed in its public filing that on or about October 7, 2017, an individual identified as "John Scott" became Sandy Steele's President, Secretary, sole officer and director.  In actuality, the officer and director (the "Initial Sandy Steele Officer") of Sandy Steele who purportedly transferred control to John Scott on or about October 7, 2017 never agreed to transfer control to John Scott; the change of control paperwork dated October 7, 2017 was fabricated; and the Initial Sandy Steele Officer's signature was forged on the fabricated October 7, 2017 change of control paperwork.

39.     "John Scott" is, in actuality, Schmidt.  For example:

    i.   On or about December 13, 2018, Schmidt created the email address "johnscott@sstu.biz;"

    ii.  On or about March 16, 2019, "John Scott" provided a copy of a passport to OTC Markets in connection with establishing an account on behalf of Sandy Steele to use OTC Markets' news and disclosure services.  The passport is fake.  The photo on the passport is a picture of Schmidt;

    iii. On or about March 20, 2019, after OTC Markets granted Schmidt an authorized user account on the basis of Schmidt's fake "John Scott" passport, Schmidt uploaded Sandy Steele's public filings on the OTC Markets' website from the

same internet protocol ("IP") address[3] that Schmidt used to access his personal email and bank accounts; and

    iv.   Schmidt paid for Sandy Steele's OTC Markets subscription fees.

40.    Thereafter, Schmidt coordinated with Roe, Warawa, and others to issue millions of purportedly unrestricted Sandy Steele shares derived from a promissory note that Sandy Steele had purportedly entered into with an entity called Arctex Capital, Inc. ("Arctex") on or about April 16, 2016 (the "Arctex Promissory Note"). The Initial Sandy Steele Officer purportedly signed the Arctex Promissory Note on Sandy Steele's behalf, and Sandy Steele supposedly issued the Arctex Promissory Note in exchange for a purported loan of $12,000. In actuality, the Arctex Promissory note was fabricated, and the Initial Sandy Steele Officer's signature on the Arctex Promissory Note was forged. The Arctex Promissory Note included a provision to enable Arctex to convert the note into 12,000,000 shares of Sandy Steele stock, in lieu of receiving repayment of principal (the Arctex Promissory Note was non-interest bearing). On or about January 22, 2018, Arctex sold and assigned the Arctex Promissory Note in four equal parts to the following defendant entities: Artefactor, Atlantean, Meadow Asia, and Thyme International (the "Initial Sandy Steele Shareholders"). As a result of the assignments, the Initial Sandy Steele Shareholders each had the right to convert $3,000 of debt into 3,000,000 shares of Sandy Steele stock.

41.    Roe is the sole director of Atlantean and its 100% beneficial owner. Warawa is listed as Atlantean's authorized signor on bank records.

---

[3] An IP address is a value made up of assigned numbers that identify how a particular computer or device accesses a computer network, such as the Internet. Every computer or device attached to a computer network requires an IP address to connect to other networked computers.

14

42. On or about June 27, 2019, all four of the Initial Sandy Steele Shareholders provided notice to Sandy Steele that they each intended to convert their promissory notes into 3,000,000 shares each.

43. On or about the same day, Schmidt—acting as John Scott—authorized each of the Initial Sandy Steele Shareholders' notices of conversion, which obligated Sandy Steele to issue an aggregate of 12,000,000 shares to the Initial Sandy Steele Shareholders.

44. During the same week, a single representative of the Initial Sandy Steele Shareholders contacted a United States-based lawyer, using an encrypted email service, on their behalf and requested that the lawyer author four opinion letters for the purpose of representing that (a) none of the Initial Sandy Steele Shareholders are affiliates of Sandy Steele; and (b) Sandy Steele's transfer agent could, therefore, issue 3,000,000 shares to each of the Initial Sandy Steele Shareholders without legends saying that the shares were restricted from trading in the public market (hereinafter referred to as "restricted legends").

45. Before issuing the opinion letters, the lawyer asked for proof that Arctex had actually loaned $12,000 to Sandy Steele. On or about June 27, 2019, the Initial Sandy Steele Shareholders' representative provided the lawyer with a copy of a bank check reflecting a $12,000 payment to Sandy Steele dated April 8, 2016. Roe and Warawa knew, or were reckless in not knowing, that this bank check is fake.

46. On or about June 29, 2019, the lawyer—relying at least in part on the fake bank check provided by the Initial Sandy Steele Shareholders' representative—issued four opinion letters to Sandy Steele's transfer agent instructing that Sandy Steele could issue 3,000,000 shares to each of the Initial Sandy Steele Shareholders without restricted legends.

47.     On or about June 29, 2019, Warawa paid the lawyer for writing the four opinion letters for each of the Initial Sandy Steele Shareholders.

48.     On or about July 24, 2019, Sandy Steele's transfer agent issued 3,000,000 shares to Atlantean without marking them as restricted for sale. As of that date, Sandy Steele had 40,745,588 total outstanding shares. Atlantean, therefore, held approximately 7.4% of Sandy Steele's outstanding shares. Sandy Steele's transfer agent ultimately issued the remaining shares—3,000,000 each—to the other Initial Sandy Steele Shareholders on or about August 8, 2019.

49.     On or about July 25, 2019, Gomes, through FFS Capital, purportedly purchased Atlantean's (i.e., Roe's and Warawa's) Sandy Steele shares for $10,000. In actuality, Roe and Warawa simply caused Atlantean to transfer its shares to Gomes so that he could sell the shares for them. Before Gomes deposited those shares in a brokerage account, he obtained a letter from another lawyer opining that FFS Capital was not an affiliate of Sandy Steele and, therefore, that Sandy Steele's transfer agent could issue to FFS Capital the 3,000,000 shares that FFS had obtained from Atlantean without a restricted legend. The attorney's opinion was based in part on Gomes' false claim that FFS Capital "will not undertake any re-sale of the Shares in concert with any other persons." In actuality, Gomes was acting in concert with members of the Sandy Steele Control Group to re-sell the shares.

50.     In furtherance of the scheme, Schmidt caused Sandy Steele to issue additional shares to "John Scott" so that FFS Capital—holding shares on behalf of Atlantean—would be holding less than 5% of Sandy Steele's total outstanding shares. Specifically, on or about July 26, 2019, Schmidt caused Sandy Steele to issue 40,000,000 restricted shares to John Scott,

thereby raising Sandy Steele's total outstanding shares to approximately 80,745,588, and reducing the percentage of shares held by FFS Capital to approximately 3.7%.

51.     The purpose of Schmidt's issuance of 40,000,000 restricted shares to himself—posing as John Scott—was to further conceal the Initial Sandy Steele Shareholders' and the Gomes Group's share ownership.  For example, OTC Markets reporting standards required Sandy Steele to disclose any 5% or greater shareholders in order for Sandy Steele to be listed as a "current" filer on the OTC Markets' website (approval as a "current" filer on the OTC Markets' website is more attractive to investors because it suggests that a company is making meaningful and current disclosures to the market).  Sandy Steele chose to comply with the OTC Markets' 5% disclosure obligations in order to be listed as "current."  By issuing additional shares to himself, Schmidt avoided having to disclose FFS Capital (or Gomes, Roe, and Warawa) as holding greater than 5% of the Sandy Steele shares.

52.     Similarly Schmidt's 40,000,000 share issuance to "John Scott" had the effect of enabling each of the remaining Initial Sandy Steele Shareholders to also hold less than 5% of Sandy Steele's outstanding shares when, on August 8, 2019, the transfer agent issued 3,000,000 shares, without marking them as restricted for sale, to each of Artefactor, Meadow Asia, and Thyme International.

53.     The Sandy Steele coordination between Schmidt, Gomes, Roe, and Warawa was not the first time that Schmidt, Roe, Warawa, and Gomes had engaged in business transactions together.  For example, between 2016 and 2017, Schmidt received approximately $783,000 in wire payments representing trading proceeds generated by an offshore asset manager named

Wintercap SA.[4]  Around the same time, Schmidt wired approximately $378,000 to a Canadian

corporation controlled, on paper, by Warawa, and approximately $50,000 to Roe's personal bank

account.  That Canadian corporation shares the same mailing address as a corporation controlled

by Roe.  Further, between approximately June 2017 and January 2018, Gomes wired over

$406,000 from an entity he controlled to the same Canadian corporation controlled by

Warawa.  And, in 2018, Roe transferred approximately $232,000 to Atlantean.  The table below

illustrates these connections:



54.     As of August 2019, FFS Capital, Artefactor, Meadow Asia, and Thyme

International collectively held more than 10% of Sandy Steele's total outstanding shares and the

vast majority (greater than 80%) of the company's shares that lacked restricted legends.

55.     Between approximately July 17, 2019 and October 17, 2019, Sandy Steele's stock

traded at an average price per share of $.06 and an average volume of 5,400 shares per day.  On

56 of the 66 trading days in that period, there were no reported sales at all.

---

[4] Wintercap SA was sued by the SEC in October 2018 for serving as a fraudulent trading platform whose business purpose was to allow undisclosed control groups to dump their shares of the companies they controlled while concealing their ownership and evading the requirements of the federal securities laws. *See SEC v. Roger Knox, et al.*, No. 18-cv-12058 (D. Mass. filed Oct. 2, 2018).

56.     Starting in September 2019 and continuing through at least March 2020, the Sandy Steele Control Group schemed to artificially inflate Sandy Steele's stock price so that Gomes and the Initial Sandy Steele Shareholders could dump Sandy Steele shares into the market and collect substantial proceeds.

### Selling Sandy Steele Stock in Connection with a False and Misleading Promotional Campaign

57.     On or about September 11, 2019, Schmidt created a corporate website for Sandy Steele (the "Sandy Steele Website") using an IP address based in Vancouver, Canada. Schmidt used the same IP address when accessing his personal email and bank accounts. On or about October 11, 2019, Schmidt accessed the OTC Markets' profile page for Sandy Steele from the same IP address and changed the profile to link to the newly created Sandy Steele Website.

58.     The Sandy Steele Control Group paid for the creation of the Sandy Steele Website using a credit card in Warawa's name.

59.     The Sandy Steele Website contained false and misleading information. For example, the website claimed—and continues to claim—that the company is manufacturing and selling garments that are currently available and have been sold to and used by customers. The website includes purported customer testimonials. But, the pictures of Sandy Steele's purported clothing items were simply copied from other websites. In actuality, Sandy Steele has reported no revenue, inventory, or current assets notwithstanding its claims on the Sandy Steele Website.

60.     Shortly after Schmidt created the Sandy Steele Website, trading in the securities of Sandy Steele increased substantially through the end of 2019. At or around the same time, investors—including elderly investors—began receiving unsolicited telephone calls from one or more individuals acting in concert with the Sandy Steele Control Group and the Gomes Group. The phone callers touted Sandy Steele as a good investment opportunity. As the table below

illustrates, trading in the securities of Sandy Steele increased dramatically in late 2019 through early 2020:



61.     Between approximately October 28, 2019 and February 3, 2020, FFS Capital and Artefactor (one of the Initial Sandy Steele Shareholders), acting in concert, sold six million shares of Sandy Steele stock through foreign securities accounts generating at least $1.8 million in proceeds.

62.     During at least November 2019, Gomes caused FFS Capital to remit hundreds of thousands of dollars of Gomes' fraudulent Sandy Steele stock sale proceeds to members of the Sandy Steele Control Group.

63.     After the initial promotional campaign, which ran from approximately October 2019 through January 2020, Sandy Steele's stock price per share dropped significantly, and there were days in which Sandy Steele's stock did not trade at all in February and March 2020.

64.     Shortly thereafter, starting in or about March 2020, one or more individuals acting

in concert with the Sandy Steele Control Group and the Gomes Group used an email marketing

service to promote Sandy Steele.  These promotions sought to capitalize on investors' responses

to the COVID-19 pandemic.  For example, starting on March 23, 2020, one or more individuals

acting in concert with the Defendants sent an email from the domains

"PennyStockTomorrow.com" which included the headline, "Alert: Shares of this stock set to go

up 200% today" and included the following statement: "The coronavirus has created a world of

opportunities for investors who know which stocks to buy. . . . [SSTU] makes clothing but also

has the possibility to manufacture health masks at those same facilities . . . ."

65.     Also in or about March 2020, Meadow Asia and Thyme International—two of the

Initial Sandy Steele Shareholders—transferred approximately 5,797,500 Sandy Steele shares to

FFS Capital (Gomes) and Paifang (Luckhoo).  Prior to 2020, Luckhoo had arranged to give

Gomes direct trading authority over the Paifang brokerage account.

66.     On or about March 20, 2020, there were no trades in the market for Sandy Steele.

Once the COVID-19-related promotions started, trading volume spiked to over 3,000,000 shares

per day on March 23 and 24, 2020.  At or about the same time, Gomes, on behalf of FFS Capital

and Paifang, began dumping Sandy Steele shares into the market.  Specifically, between March

23 and April 3, FFS Capital and Paifang sold an additional 3,932,162 shares of Sandy Steele

before the Commission's suspension of trading, which was effective before trading commenced

on April 6, 2020.

67.     Roe and Warawa each knew, or were reckless in not knowing, that they secretly

controlled Sandy Steele with Schmidt and that, as a result, they were legally prohibited from

selling their shares publicly unless they complied with stock registration requirements or sale restrictions.

68.     Gomes knew, or was reckless in not knowing, that he was facilitating the illegal sale of Sandy Steele stock by the Sandy Steele Control Group.

69.     Luckhoo knew, or was reckless in not knowing, that he was using Paifang to create a layer of anonymity so as to facilitate Gomes' illegal sales of Sandy Steele shares. Specifically, Gomes avoided being listed on corporate documents as controlling Paifang by using Luckhoo as its purported director. This facilitated the charade that FFS Capital and Paifang were separate entities that each held less than 5% of Sandy Steele's outstanding stock. In actuality, Gomes had investment power over the shares held by FFS Capital and Paifang, which collectively controlled greater than 5% of Sandy Steele's outstanding stock.

70.     Schmidt, Roe, Warawa, Gomes, and Luckhoo each knew, or were reckless in not knowing, that they were dumping Sandy Steele shares to unsuspecting investors in coordination with (i) Schmidt's creation of the false and misleading Sandy Steele Website; (ii) Schmidt's use of an alias, John Scott, to secretly operate Sandy Steele; and (iii) the distribution of false and misleading stock promotions concerning Sandy Steele by one or more individuals with whom they were acting in concert.

## SALES OF OTHER COMPANIES' STOCK

71.     From at least 2018 to the present, Gomes—working with Luckhoo—fraudulently sold large blocks of stock of various other publicly traded companies, and he sold that stock without exemptions from registration or effective registration statements in effect with the Commission.

**Additional Examples**

**Bioscience**

72.     Bioscience is a Nevada company incorporated in June 2010 under a different

name.  Bioscience's common stock has been registered with the Commission pursuant to Section

12(g) of the Exchange Act since 2014.  Section 13(d) of the Exchange Act and rules thereunder

require Bioscience shareholders who obtain, individually or as a group, greater than 5% of

Bioscience's stock to file public disclosures of their ownership on a Schedule 13D.

73.     In or about December 2018, Bioscience changed its name and purported business

model from "essential oils" to "seeking new business opportunities with established entities for

merger with or acquisition of a target business."

74.     In or about February 2019, Bioscience effected a 1-for-40 reverse split, which

meant that every 40 shares held by Bioscience's shareholders would be converted to one share.

The reverse split had the effect of reducing the number of Bioscience's outstanding shares.

Following the reverse split, Bioscience had 242,516 shares outstanding of which 205,000

restricted shares were held by its Chief Executive Officer ("CEO").

75.     During 2019, Bioscience issued another 7,000,000 restricted shares to its CEO

and 400,000 unrestricted shares each to two shareholders who subsequently transferred their

stock to FFS Capital and Paifang.  Luckhoo granted trading authority to Gomes over the Paifang

shares.  Thereafter, Gomes and Luckhoo arranged to deposit the FFS Capital and Paifang shares

(representing approximately 9.9% of the total outstanding stock of Bioscience) in Canadian

brokerage accounts over which Gomes had control.

76.     When Gomes and Luckhoo arranged to deposit the Bioscience shares, they

comprised approximately 95% of Bioscience's shares deposited and (because they were not

marked as restricted) purportedly available to trade.  Gomes was an affiliate of Bioscience by virtue of his control over the vast majority of the shares deposited and purportedly available to trade.

77.     Despite the fact that FFS Capital and Paifang operated as a group controlled by Gomes—as reflected by Gomes' investment power over the shares held by both entities—Gomes intentionally or recklessly failed to file a Schedule 13D beneficial ownership report.  In this way, Gomes avoided disclosing the coordination of these entities and their significant control over Bioscience's stock.

78.     Between approximately January 27 and April 21, 2020, Gomes generated at least $1.3 million in proceeds from illegal sales of Bioscience stock.  At or about the same time that Gomes sold Bioscience stock, one or more individuals with whom Gomes was acting in concert sent emails that touted Bioscience's stock through the domain "PennyStockTomorrow.com" as a good investment opportunity.  These touts contained false and misleading information. Bioscience, in actuality, had no revenue, assets or operations.

79.     "PennyStockTomorrow.com" was operated by the same individuals who operated the domain "ThePennyStockInsiders.com," which touted Sandy Steele at the time Gomes sold stock in that company.

80.     Gomes knew, or was reckless in not knowing: (i) that FFS Capital and Paifang were required by law to register any public sale of Bioscience shares or limit such sales in accordance with the rules governing sales of affiliate shares; (ii) that he was legally required to file a Schedule 13D before selling FFS Capital's and Paifang's Bioscience shares; and (iii) that he was selling Bioscience stock at a time when one or more individuals with whom he was

acting in concert were disseminating false and misleading information to investors concerning Bioscience.

81.     Luckhoo knew, or was reckless in not knowing, that he was using Paifang to create a layer of anonymity to facilitate Gomes' illegal sales of Bioscience shares.  Specifically, Gomes avoided being listed on corporate documents as controlling Paifang by using Luckhoo as its purported director.  This facilitated the charade that FFS Capital and Paifang were separate entities that each held less than 5% of Bioscience's outstanding stock.  In actuality, FFS Capital and Paifang operated as a group controlling greater than 5% of Bioscience's outstanding stock.

**WOD Retail Solutions, Inc.**

82.     WOD Retail is a Florida company incorporated in 1981 under a different name.

83.     On or about April 16, 2020, in its Form 10-K for the year-ended December 31, 2019, WOD Retail claimed in a public filing that it owned vending automated "kiosks" that sell equipment and other items at fitness centers without the need for employees to spend their time on the transaction.  In actuality, WOD Retail did not earn any revenue in 2018 or 2019.  The creators of WOD Retail's public website copied pictures of kiosks from other, unaffiliated, websites and edited them to include the WOD Retail logo, then displayed them on WOD Retail's website as the company's own products.

84.     After years of relative public market inactivity, the company changed its name in September 2018 to WOD Retail and conducted a 1-for-3,000 reverse split of its shares, thereby significantly decreasing both total outstanding shares and the amount of its shares eligible for public trading.

85.     On or about October 31, 2019, WOD Retail issued 60 million restricted shares to its CEO, and on the next day issued 10 million shares each to four different shareholders,

including Meadow Asia and Thyme International (collectively, with the other two shareholders that received shares that day, the "Initial WOD Retail Shareholders"). The Initial WOD Retail Shareholders, directly or indirectly, deposited these 40 million shares with foreign broker-dealers shortly after they were issued.

86.     Soon after October 31, 2019, the Initial WOD Retail Shareholders arranged to have restricted legends on their shares removed, at which time they collectively controlled approximately 97% of WOD Retail's stock that was not marked as restricted, which amounted to approximately 40% of the total outstanding common shares.

87.     On or about November 8, 2019, Gomes, through FFS Capital, agreed to acquire 10 million shares of WOD Retail from one of the Initial WOD Retail Shareholders. That month, Gomes arranged to provide WOD Retail's transfer agent with a "seller/shareholder's representation letter for non-affiliates." The purpose of this document was to cause the transfer agent to re-issue FFS Capital's 10 million shares of WOD Retail stock without a restricted legend. Gomes signed the letter, which falsely represented that FFS Capital "is not, has not been, and will not be acting in concert with any other person in connection with either its acquisition of the [WOD Retail] Stock or its current intended sale or transfer of the Stock." In actuality, as Gomes well knew, FFS Capital was acting in concert with the Initial WOD Retail Shareholders. Shortly thereafter, Gomes obtained the WOD Retail shares without a restricted legend and arranged for the shares to be deposited with a Canadian broker-dealer.

88.     The Initial WOD Retail Shareholders and Gomes were, in actuality, affiliates of WOD Retail. The Initial WOD Retail Shareholders and Gomes acted in concert with each other and collectively controlled the company's stock, including their control of 97% of the shares purportedly available for trading.

89.     Starting in December 2019 and continuing through at least March 2020, Gomes

sold WOD Retail shares through FFS Capital.  One of the Initial WOD Retail Investors also sold

WOD Retail shares during at least early 2020.  During that period of time, one or more

individuals with whom Gomes and the Initial WOD Retail Investors were acting in concert

orchestrated a stock promotional campaign.  As the table below illustrates, the stock promotional

campaign produced a substantial increase in the price per share and volume of public trading in

WOD Retail's stock.



90.     The individuals who orchestrated the WOD Retail stock promotional campaign

were also behind the Sandy Steele and Bioscience stock promotional campaigns, but this time

they used the domain "PennyStockBargain.com" to issue emails to investors.  The emails were

false and misleading in that they claimed the company's kiosks were a solution for retailers in

response to the COVID-19 pandemic. In actuality, WOD Retail reported no revenue and reported that it only owned three kiosks when it filed its annual report in April 2020 for the year-ended December 31, 2019.

91.     Gomes, through FFS Capital, and at least one of the Initial WOD Retail Shareholders generated at least $1.7 million in fraudulent proceeds from the sale of WOD Retail stock from approximately December 16, 2019 to May 20, 2020.

92.     The Commission suspended trading in the securities of WOD Retail on May 21, 2020.

93.     Gomes knew, or was reckless in not knowing, that FFS Capital was required by law to register any public sale of WOD Retail shares or limit such sales in accordance with the rules governing sales of affiliate shares. Specifically, Gomes knew, or was reckless in not knowing, that he and the Initial WOD Retail Shareholders held effective control over the company, and that they were combining to sell WOD Retail stock at a time when one or more individuals with whom they were acting in concert were disseminating false and misleading information to investors concerning WOD Retail.

### Ongoing Conduct

94.     Since January 2020, the Commission has suspended trading in four stocks which were principally dumped by the Gomes Group, three of which concerned trading in the securities of Sandy Steele, Bioscience and WOD Retail. The Gomes Group, nonetheless, continues to operate and is in possession of many other securities that lack restricted legends—with similar profiles to Sandy Steele, Bioscience, and WOD Retail—held in brokerage accounts and held in nominees' names.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Sections 17(a)(1), (3) of the Securities Act by Gomes, FFS Capital, Schmidt, Roe, Warawa, Luckhoo, and Atlantean)

95.     Paragraphs 1 through 94 above are re-alleged and incorporated by reference as if fully set forth herein.

96.     By reason of the conduct described above, Gomes, FFS Capital, Schmidt, Roe, Warawa, Luckhoo, and Atlantean, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

97.     By reason of the conduct described above, Gomes, FFS Capital, Schmidt, Roe, Warawa, Luckhoo, and Atlantean violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1), (3)].

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by Gomes, FFS Capital, Schmidt, Roe, Warawa, Luckhoo, and Atlantean)

98.     Paragraphs 1 through 94 above are re-alleged and incorporated by reference as if fully set forth herein.

99.     By reason of the conduct described above, Gomes, FFS Capital, Schmidt, Roe, Warawa, Luckhoo, and Atlantean, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i)

employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses

of business which operated or would operate as a fraud or deceit upon any persons, including

purchasers or sellers of the securities.

100.     By reason of the conduct described above, Gomes, FFS Capital, Schmidt, Roe,

Warawa, Luckhoo, and Atlantean violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and

Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a), (c)] thereunder.

### THIRD CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) by Schmidt)

101.     Paragraphs 1 through 94 above are re-alleged and incorporated by reference as if

fully set forth herein.

102.     By reason of the conduct described above, Schmidt, directly or indirectly, in

connection with the purchase or sale of securities, by the use of the means or instrumentalities of

interstate commerce or of the mails, or of any facility of any national securities exchange,

intentionally, knowingly or recklessly, made untrue statements of material facts or omitted to

state material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading.

103.     By reason of the conduct described above, Schmidt violated Exchange Act

Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)] thereunder.

### FOURTH CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES
### (Violations of Sections 5(a) and 5(c) of the Securities Act by Gomes, FFS Capital, Roe, Warawa, Luckhoo, Atlantean, Paifang, Artefactor, Meadow Asia, and Thyme International)

104.     Paragraphs 1 through 94 above are re-alleged and incorporated by reference as if

fully set forth herein.

105.     By reason of the conduct described above, Gomes, FFS Capital, Roe, Warawa, Luckhoo, Atlantean, Paifang, Artefactor, Meadow Asia, and Thyme International, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, one or more of the securities identified in Paragraph 34, as to which no registration statement has been filed and for which no exemption from registration has been available.

106.     As a result, Gomes, FFS Capital, Roe, Warawa, Luckhoo, Atlantean, Paifang, Artefactor, Meadow Asia, and Thyme International violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

### FIFTH CLAIM FOR RELIEF
### FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP
**(Violation of Section 13(d)(1) and Rule 13d-1 by Gomes)**

107.     Paragraphs 1 through 94 above are re-alleged and incorporated by reference as if fully set forth herein.

108.     During the period subject to this Complaint, the stock of Bioscience was a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

109.     During the period described in this Complaint, Bioscience had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

110.     By reason of the conduct described in this Complaint, defendant Gomes, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of

Bioscience equity securities, failed to file statements with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquired such shares.

111.    By reason of the conduct described above, defendants Gomes, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Bioscience equity securities, disposed of beneficial ownership of 1 percent or more of that class of equity securities and failed to file with the Commission an amendment disclosing this material change.

112.    As a result, Gomes violated and, unless enjoined, will continue to violate Section 13(d)(1) of the Exchange Act [15 U.S.C. §78m(d)(1)] and Rule 13d-1 thereunder [17 C.F.R. §240.13d-1].

**SIXTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Gomes, Luckhoo, and FFS Capital)**

113.    Paragraphs 1 through 94 above are re-alleged and incorporated by reference as if fully set forth herein.

114.    By reason of the conduct described above, Roe, Warawa, Atlantean, Paifang, Artefactor, Meadow Asia, and Thyme International, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, one or more of the securities identified in

Paragraph 34, as to which no registration statement has been filed and for which no exemption from registration has been available.

115.    By reason of the conduct described above, Schmidt, Roe, Warawa, and Atlantean directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

116.    Gomes, Luckhoo, and FFS Capital knowingly or recklessly provided substantial assistance to Roe, Warawa, Atlantean, Paifang, Artefactor, Meadow Asia, and Thyme International in their violations of Sections 5(a) and (c) of the Securities Act.

117.    Gomes, Luckhoo, and FFS Capital knowingly or recklessly provided substantial assistance to Schmidt, Roe, Warawa, and Atlantean in their violations of Section 17(a)(1) and (3) of the Securities Act.

118.    As a result, Gomes, Luckhoo, and FFS Capital each violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

## SEVENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
**(Violations of Section 20(e) of the Exchange Act by Gomes, Luckhoo, and FFS Capital)**

119.    Paragraphs 1 through 94 above are re-alleged and incorporated by reference as if fully set forth herein.

120.    By reason of the conduct described above, Schmidt, Roe, Warawa, and Atlantean, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

121.    Gomes, Luckhoo, and FFS Capital knowingly or recklessly provided substantial assistance to Schmidt, Roe, Warawa, and Atlantean in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

122.    As a result, Gomes, Luckhoo, and FFS Capital each violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Permanently enjoin Gomes, FFS Capital, Schmidt, Roe, Warawa, Luckhoo, and Atlantean, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating or aiding and abetting violations of

Section 17(a) of the Securities Act [15 U.S.C. §77q], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

  B.  Permanently enjoin Gomes, FFS Capital, Roe, Warawa, Luckhoo, Atlantean, Paifang, Artefactor, Meadow Asia, Thyme International and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating or aiding and abetting violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

  C.  Permanently enjoin Gomes and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 13(d) of the Exchange Act [15 U.S.C. §§78m(d)(a)] and Rule 13d-1 thereunder [17 C.F.R. §240.13d-1].

  D.  Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

  E.  Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

  F.  Enter an order barring Gomes, Warawa, Luckhoo, Schmidt, FFS Capital, Paifang, Artefactor, Atlantean, Meadow Asia, and Thyme International from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)];

G.      Enter an order barring Gomes and FFS Capital from directly or indirectly, including but not limited to, through an entity owned or controlled by Gomes, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Gomes from purchasing or selling securities listed on a national securities exchange for his own personal account;

H.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

I.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED: June 9, 2020.

Respectfully Submitted

/s/ Eric A. Forni
Eric A. Forni (Mass Bar No. 669685)
Kathleen B. Shields (Mass Bar No. 637438)
Amy Gwiazda (Mass Bar No. 663494)
Martin Healey (Mass Bar No. 227550)

SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8827 (Forni direct),
(617) 573-8904 (Shields direct)
Fax: (617) 573-4590 (fax)
ForniE@sec.gov (Forni email); ShieldsKa@sec.gov
(Shields email)